# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**KATHLEEN G. HEFLICK**
          **Plaintiff,**

          **v.**                                                    **Case No. 08-C-996**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
                    **Defendant.**

---

## DECISION AND ORDER

On March 28, 2005, plaintiff Kathleen Heflick applied for disability insurance benefits ("DIB"), alleging that she had been unable to work since January 1, 2003 due to chronic leg and back pain, an over-active bladder, and various other conditions. (Tr. at 63; 68; 87.) In order to obtain DIB, plaintiff had to demonstrate that she became disabled while in "insured status." 42 U.S.C. § 423; Stevenson v. Chater, 105 F.3d 1151, 1154 (7th Cir. 1997); see also 20 C.F.R. § 404.130 (setting forth methods of determining insured status). Based on her past earnings, plaintiff's "date last insured" was September 30, 2004.

The Social Security Administration ("SSA") determined that plaintiff had not established disability during the relevant time period (Tr. at 40; 41; 46; 52), as did an Administrative Law Judge ("ALJ") following a hearing (Tr. at 14-23). Plaintiff sought review by the SSA's Appeals Council, but the Council denied her request (Tr. at 4), making the ALJ's decision final. See Liskowitz v. Astrue, 559 F.3d 736, 739 (7th Cir. 2009). Plaintiff now seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g).

# I. APPLICABLE LEGAL STANDARDS

## A. Judicial Review

Under § 405(g), the court reviews an ALJ's decision to determine whether it is supported by "substantial evidence" and consistent with applicable law. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable mind could accept as adequate to support a conclusion. Berger v. Astrue, 516 F.3d 539, 544 (7th Cir. 2008) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Under this standard, the court may not decide facts anew, re-weigh the evidence or substitute its judgment for the ALJ's. If the record contains conflicting evidence that would allow reasonable people to differ as to whether the claimant is disabled, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).

However, this does not mean that the court simply rubber stamps the decision without a critical review of the record. See, e.g., Scott v. Barnhart, 297 F.3d 589, 593 (7th Cir. 2002); Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000). Conclusions of law are entitled to no deference, so if the ALJ commits legal error the court may reverse regardless of the volume of evidence in support of the factual findings. Binion, 108 F.3d at 782. Failure to comply with the SSA's regulations for evaluating disability claims constitutes legal error. See Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991). The court likewise cannot uphold a decision that lacks a meaningful discussion of important evidence, see, e.g., Giles v. Astrue, 483 F.3d 483, 486 (7th Cir. 2007); Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005), fails to build an accurate and logical bridge from the evidence to the conclusion, see, e.g., Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002); Groves v. Apfel, 148 F.3d 809, 811 (7th Cir. 1998), or

2

contains flawed logic or serious errors in reasoning, see, e.g., Indoranto v. Barnhart, 374 F.3d 470, 475 (7th Cir. 2004) (citing Carradine v. Barnhart, 360 F.3d 751, 754-56 (7th Cir. 2004)).

**B.    Disability Standard**

The SSA has adopted a sequential five-step test for determining disability, pursuant to which the ALJ asks:

    (1)    Is the claimant is working?

    (2)    If not, does the claimant have a severe impairment, i.e. one that significantly limits her physical or mental ability to perform basic work activities?

    (3)    If so, does the impairment meet or equal any of the particular impairments listed at 20 C.F.R. Pt. 404, Subpart P, Appendix 1, (i.e. the "Listings"), which the SSA regards as conclusively disabling?

    (4)    If not, does the claimant possess the residual functional capacity ("RFC") to perform her past relevant work?

    (5)    If not, can the claimant perform other types of work?

See, e.g., Stevenson, 105 F.3d at 1154.

An affirmative answer at any step leads either to the next step, or, at steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that the claimant is not disabled. The claimant bears the burden of producing evidence at steps 1 through 4, but if she reaches step 5 the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy. E.g., Patterson v. Barnhart, 428 F. Supp. 2d 869, 872 (E.D. Wis. 2006) (citing Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001)).

3

## II. FACTS AND BACKGROUND

**A.    Medical Evidence**

   **1.    Treating Sources**

Plaintiff began receiving primary care from Dr. Christopher Gilman on February 18, 2002, and during her initial visit she complained of various problems including loss of appetite, chills and night sweats, unusual fatigue, hives and rashes, occasional migraine headaches, and late day pain in the knees and ankles.  She also noted urge incontinence symptoms, requiring her to void every hour unless she drank coffee, in which case it would be every twenty minutes. (Tr. at 173.)  Dr. Gilman noted a past history of scoliosis as well as joint pain and trauma secondary to plaintiff's many years as an equestrian.  Dr. Gilman recorded plaintiff's height as 5'5½" and weight as 192 pounds, for a BMI of 31.5,[1] and her blood pressure as 184/100.  (Tr. at 174.)  Dr. Gilman assessed hypertension, multiple symptom complex and a possible mood disorder; he ordered tests and started plaintiff on blood pressure medication. (Tr. at 174-75.)

Plaintiff returned to Dr. Gilman on March 8, complaining of intermittent discomfort about the lower legs and ankles.  Plaintiff's hypertension was improved and abdominal testing had come back normal, but Dr. Gilman did note hyperlipidemia and referred plaintiff to a dietician. (Tr. at 169.) When plaintiff returned on April 12, Dr. Gilman again noted improved hypertension and recommended exercise and strict dietary management.  He believed her mood disorder seasonally caused and recommended a light box.  (Tr. at 166.)

On May 13, plaintiff again complained of fatigue, which Dr. Gilman suspected was

---

[1]This BMI ("Body Mass Index") qualified plaintiff as obese under federal guidelines. See http://www.nhlbi.nih.gov/guidelines/obesity/ob_home.htm.

4

related to elevated lipid levels. He obtained another lipid panel, then suggested prescription Lipitor. (Tr. at 164.) Plaintiff declined medication in favor of diet, exercise and garlic. (Tr. at 162.)

Plaintiff returned to Dr. Gilman on December 12, noting the onset of severe right knee pain and instability three weeks previously. She further complained of intermittent swelling of the left knee with slight discomfort over the past five years. Plaintiff walked with a decided limp, and Dr. Gilman noting swelling of the right knee, tenderness to palpation and limited extension. The left knee was, at the time, normal. (Tr. at 157.) X-rays of plaintiff's knees showed moderate degenerative changes on the left and slight degenerative osteophyte development on the right. (Tr. at 159.) Dr. Gilman prescribed Vicodin and Naprosyn. (Tr. at 158.) On December 27, Dr. Gilman noted that the Vicodin had not been terribly helpful, but the Naprosyn significantly reduced plaintiff's swelling and pain, and plaintiff had almost full extension and flexion of the knee. Dr. Gilman diagnosed degenerative joint disease, right knee, with inflammatory arthritis; hypertension, inadequately controlled; and hyperlipidemia. (Tr. at 156.)

On January 28, 2003 (her first visit after her alleged disability onset), plaintiff reported discomfort about the lateral aspect of the left knee, as well as pain in the ankles. Dr. Gilman assessed degenerative joint disease, multiple joints, predominantly knees and ankles; hypertension, inadequately controlled; and obesity. He increased her blood pressure medication dosage and continued her on pain medication. (Tr. at 155.)

Plaintiff returned on April 11, indicating that her right knee could become swollen at any moment. On exam, Dr. Gilman noted no obvious swelling and effusion, and continued medications. (Tr. at 154.) On July 31, plaintiff continued to complain of fatigue and migratory discomfort in multiple parts of her body. She further advised the doctor of bladder over-activity,

5

voiding sometimes eight times per hour, which caused social difficulty in terms of shopping or taking car trips. (Tr. at 147.) Dr. Gilman assessed obesity, hypertension, symptom complex compatible with fibromyalgia, and detrusor hyperactivity. He increased her blood pressure medication dosage and prescribed Flexeril, a muscle relaxant, and Ditropan for bladder symptoms. (Tr. at 148.) On August 11, plaintiff reported dizziness from her blood pressure medication, and Dr. Gilman advised tapering off and discontinuing its use. (Tr. at 146A; 153.)

On October 29, plaintiff came in to renew her medications. She continued to use Ditropan as needed for bladder control when out of the home. Plaintiff had lost nine pounds since her last visit, and her degenerative joint disease complaints appeared under adequate control with Naprosyn and nighttime Vicodin. (Tr. at 146.) However, when plaintiff returned to Dr. Gilman on April 5, 2004, she reported a "plethora of issues" including headache, blurred vision, epigastric discomfort, stiff neck, and tingling in her arms and legs. (Tr. at 145.) On July 14, plaintiff returned to renew medications, reporting continued musculoskeletal pain. Dr. Gilman renewed Naprosyn, hydrocodone and Flexeril. (Tr. at 141.) He called in further medication renewals on June 10, 2004 and August 16, 2004. (Tr. at 141; 135.)

On November 1, 2004, plaintiff saw Julie Lynch, DO, complaining of pain going down both arms, low back pain and bilateral leg pain. Dr. Lynch noted a history of severe scoliosis and chronic back problems, as well as urinary incontinence. (Tr. at 188.) On November 22, 2004 and April 16, 2005, plaintiff returned to Dr. Lynch for back manipulation, reporting good days and bad days with her knees, back and feet. (Tr. at 177; 178.)

On February 8, 2005, plaintiff saw Dr. Gilman to renew her medications related to chronic left knee pain. (Tr. at 402.) She returned on April 18, reporting an increase in her medication use to four times per day due to intolerable pain. X-rays of her left knee showed

6

further progression of degenerative changes. (Tr. at 401.) Plaintiff saw Dr. David Huibregtse for an orthopedic consult on April 22, and the doctor diagnosed advanced degenerative joint disease, suggesting total knee arthroplasty; plaintiff declined surgery but agreed to a cortisone injection. (Tr. at 396-97.) On May 16, plaintiff advised Dr. Gilman of remarkable improvement after the injection. (Tr. at 394.) Plaintiff returned to Dr. Gilman on August 16 related to her hypertension, detrusor activity and chronic pain syndrome secondary to degenerative joint disease in multiple sites, and the doctor renewed her medications. (Tr. at 390-91.)

On August 24, Dr. Gilman completed a report regarding plaintiff's urinary incontinence, in which he indicated that she had to use the bathroom four times per hour, that she suffered incontinence episodes two to three times per week, and that she could not work a normal work schedule, with customary breaks, without experiencing "accidents." (Tr. at 215-16.) He also completed a report evaluating plaintiff under Listing 1.02(A), joint dysfunction – weight bearing joint, in which he indicated that plaintiff experienced chronic left knee pain requiring use of medication. (Tr. at 217.) He further indicated that she could not ambulate without use of a cane and could not walk a block at a reasonable pace on rough or uneven surfaces. (Tr. at 218.) She could not negotiate stairs in a normal fashion and had to elevate her legs two to three times per day for thirty to forty-five minutes with ice. (Tr. at 219.)

On October 17, plaintiff returned to Dr. Lynch for another back adjustment, stating that over the past three months her back had become increasingly sore. She also complained of hip pain, radiating down her right leg. (Tr. at 250.)

Plaintiff saw Dr. Gilman again on October 24, complaining of a burning sensation in the lower extremities bilaterally and a similar sensation through her generalized skin surface, as well as weight loss and fatigue. Dr. Gilman ordered various tests (Tr. at 387-88), which

7

revealed elevated triglycerides. On November 9, Dr. Gilman renewed plaintiff's pain medication and recommended that she begin using Prilosec. (Tr. at 381.) Plaintiff returned to Dr. Gilman on March 9, 2006, with sub-optimally controlled hypertension, but declined blood pressure medication. (Tr. at 379.)

Plaintiff saw Dr. Lynch on May 5, 2006 and received further treatment for back pain. (Tr. at 251.) On July 31, she complained of left knee pain and compensatory swelling of the left foot, and again received treatment for her back, which restored range of motion. (Tr. at 252.) She continued treating with Dr. Lynch through May 2007. (Tr. at 253-61.) In November 2007, plaintiff suffered an anterior communicating artery aneurysm. (Tr. at 276-360.)[2]

### 2. State Agency Consultants

On July 6, 2005, consultant Dr. Robert Callear completed a physical RFC report for the SSA, finding plaintiff capable of light work (lifting up to twenty pounds occasionally, ten pounds frequently; standing/walking about six hours in an eight hour day; sitting about six hours in an eight hour day; and pushing/pulling in unlimited fashion) with no additional limitations. (Tr. at 207-14.) On October 4, 2005, Roger Rattan, Ph. D, completed a psychiatric review technique form for the SSA, in which he indicated that plaintiff had no severe mental impairment. (Tr. at 229.) He noted her history of "seasonal affective disorder" but rated her degree of limitation as none or mild. (Tr. at 232, 239.)

## B. Hearing Testimony

### 1. Plaintiff

Plaintiff testified that she was fifty-nine years old, married and lived with her husband.

---

[2]Since this condition entirely post-dates plaintiff's last-date insured, I do not further discuss it.

(Tr. at 441.)  She testified that she last worked as a sales manager for a furniture company, ending in 1999 when she lost the job due to a down-sizing.  Prior to that she worked as a receptionist.  (Tr. at 447; 461; 463; 481-82.)  Plaintiff indicated that at one point she operated a horse farm but made no money from it.  (Tr. at 448.)  In 2004, she helped care for her granddaughter, feeding her breakfast and putting her on the bus in the morning, and picking her up and looking after her for about forty-five minutes until the child's mother came home from work.  (Tr. at 456-57.)

Regarding her impairments, plaintiff stated that she needed to use the bathroom a couple of times every hour and wore protection to guard against accidents.  (Tr. at 442.)  Medication helped, delaying her trips to the rest room for a couple hours, but the problem returned as soon as the medication wore off.  (Tr. at 442-43.)  She stated that the urge was still there, and that she could not get through an eight-hour workday even with medication.  (Tr. at 444.)  She stated that she had battled urinary incontinence for ten years, and that it started to become an issue at her last job.  (Tr. at 461.)

Plaintiff also testified to pain in both knees, worse on the left.  She stated that she used a cane for stabilization, tried to avoid stairs, and that her husband took the laundry down into the basement.  (Tr. at 449-51.)  She testified that her knees swelled at times, requiring her to elevate her legs several hours per day.  (Tr. at 451-54; 462.)  She also complained of arthritis in the hands and shoulder, and pain in her back.  (Tr. at 454.)

### 2.    Plaintiff's Husband

Plaintiff's husband, Jesse Heflick, testified that he had been married to plaintiff since 1992.  (Tr. at 464.)  He indicated that her problems with urinary frequency began in 1998, shortly before her last job ended in 1999.  (Tr. at 467-68.)  He stated that by 2003 she had to

9

use the bathroom at least every hour, sometimes a couple of times per hour. He also stated that she acquired a cane in early 2003 but was reluctant to use it in public due to pride. (Tr. at 469.) In 2003, she used the cane occasionally, on bad days, about two or three days per week. (Tr. at 470.) At times her knee would swell, requiring her to lay down and prop it up. (Tr. at 471.) He also stated that in 2003 she regularly experienced insomnia. (Tr. at 473-74.) He would at times come home from work in the afternoon and find her napping. She would awake, prepare a simple dinner, then collapse in front of the TV until bedtime. (Tr. at 475.) He stated that he took care of lawn care, garbage and the like. (Tr. at 477.)

### 3. The VE

The ALJ summoned a vocational expert ("VE") to the hearing to assist in evaluating plaintiff's ability to work in light of her limitations. The VE reviewed plaintiff's work history in the fifteen years preceding her last date insured, identifying two jobs – receptionist (sedentary, semi-skilled work) and sales manager (light, skilled work) – with no skills transferrable to other work at the sedentary level. (Tr. at 484.) The ALJ then asked two hypothetical questions, assuming a person of plaintiff's age, education and work experience. The first question assumed a person capable of light work with no more than occasional climbing, stooping, bending, crouching, crawling or kneeling. The VE testified that such a person could perform both of plaintiff's past jobs. (Tr. at 484.) The second question was the same, except the person was limited to sedentary work. The VE stated that this person could perform only the receptionist job. (Tr. at 484.)

Plaintiff's counsel added to the first hypothetical the need to use a cane; the VE stated that the person could not do the sales manager work but could do receptionist work at the sedentary level. (Tr. at 485.) If the person had to elevate her feet for a total of two hours in

10

the workday, she could not perform any of the past jobs. Likewise, if the person needed unscheduled breaks to use the bathroom and had accidents, neither past job could be done. (Tr. at 485.) Finally, if the person needed a two hour afternoon nap, no work could be done. (Tr. at 486.)

## C.    ALJ's Decision

The ALJ denied plaintiff's application. As indicated above, plaintiff's date last insured was September 30, 2004, and she therefore had to establish disability prior to that date in order to obtain DIB. (Tr. at 14.) Following the five-step process, the ALJ determined that plaintiff had not worked since January 1, 2003, her alleged disability onset date, and that during the relevant period she suffered from severe impairments including a knee problem, back impairment and obesity (Tr. at 17), none of which met or equaled a Listing (Tr. at 19). The ALJ found non-severe plaintiff's detrusor overactivity with urge incontinence, hypertension and hyperlipidemia. The ALJ noted that at one point Dr. Gilman offered a provisional diagnosis of fibromyalgia, but the doctor did not further mention the condition. The ALJ also noted that plaintiff suffered a stroke in November 2007, but that was three years after her date last insured. (Tr. at 19.)

The ALJ then determined that, through her date last insured, plaintiff retained the RFC for lifting no more than twenty pounds, ten pounds frequently, with no more than occasional climbing, stooping, bending, crouching, crawling and kneeling. (Tr. at 20.) In making this determination, he rejected Dr. Gilman's August 2005 reports, finding that they had no bearing on plaintiff's level of functioning prior to her date last insured. (Tr. at 23.) Based on this RFC and relying on the VE's testimony, the ALJ concluded that plaintiff could perform her past work as a sales manager and receptionist. He therefore found that she was not disabled at any time between January 1, 2003 and September 30, 2004. (Tr. at 23.)

11

## III.  DISCUSSION

Plaintiff argues that the ALJ erred in (1) determining her RFC, (2) evaluating the credibility of the testimony and (3) posing hypothetical questions to the VE.  I address each argument in turn.

### A.     RFC

#### 1.     Legal Standard

RFC is the most an individual can do, despite her impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. In setting RFC, the ALJ must consider both the "exertional" and "non-exertional" capacities of the claimant.  Exertional capacity refers to the claimant's strength-related abilities: sitting, standing, walking, lifting, carrying, pushing and pulling.  Non-exertional capacity includes all work-related functions that do not depend on the individual's physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) activities. SSR 96-8p. Because the first consideration at step four of the sequential evaluation process is whether the individual can do past work as she actually performed it, RFC should not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work.  Rather, the ALJ should separately assess the claimant's ability to perform each of the seven strength demands before translating the physical RFC into a category.  See, e.g., Blom v. Barnhart, 363 F. Supp. 2d 1041, 1057 (E.D. Wis. 2005) (citing Nolen v. Sullivan, 939 F.2d 516, 518 (7th Cir. 1991); Strittmatter v. Schweiker, 729 F.2d 507, 509 (7th Cir. 1984)).

12

The ALJ's RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. The ALJ must also explain how he resolved any material inconsistencies or ambiguities in the evidence. SSR 96-8p. "[T]the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." Villano v. Astrue, 556 F.3d 558, 563 (7th Cir. 2009) (citing SSR 96-8p; Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir. 2003)).

Finally, the ALJ may not in determining RFC "play doctor" and make his own independent medical findings. See Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996). Rather, the ALJ must consider and address the medical source opinions of record, and if his RFC assessment conflicts with an opinion from a medical source, he must explain why the opinion was not adopted. SSR 96-8p. Medical opinions from a treating physician (a/k/a "treating source") about the nature and severity of the claimant's impairments are entitled to "special significance" and will, if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record, be given "controlling weight." SSR 96-8p; Clifford, 227 F.3d at 870. Even if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, he may not simply reject it. SSR 96-2p. Rather, he must evaluate the opinion's weight by looking at the length, nature and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p. Regardless of the weight the

13

ALJ ultimately gives the treating source opinion, he must always "give good reasons" for his decision. 20 C.F.R. § 404.1527(d)(2). If the ALJ is unable to ascertain the basis for a treating source's opinion, he may be required to re-contact the source for clarification. See SSR 96-5p; see also Barnett v. Barnhart, 381 F.3d 664, 669 (7th Cir. 2004); Eggerson v. Astrue, 581 F. Supp. 2d 961, 966 (N.D. Ill. 2008).

**2.  Analysis**

As noted above, the ALJ found plaintiff capable of lifting no more than twenty pounds, ten pounds frequently, with only occasional postural movements. (Tr. at 20.) The ALJ did not specifically find plaintiff capable of "light" or any other exertional category of work; however, it appears based on the weight limitations, the hypothetical questions to the VE and the step four determination (Tr. at 23; 484), that the ALJ intended to find plaintiff capable of light work.[3] This made consideration of plaintiff's ability to walk and stand most of the day important. See 20 C.F.R. § 404.1567(b) (stating that light work requires a good deal of walking or standing); SSR 83-10 ("Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing – the primary difference between sedentary and most light jobs.").

Yet the ALJ failed to address any limitations on walking and standing, despite finding severe both plaintiff's knee problem and her obesity. See SSR 02-1p (stating that "someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation

_____

[3]The ALJ found that plaintiff could perform both of her past occupations, as they were actually and generally performed. (Tr. at 23.) The VE testified that a person capable of light work under the ALJ's hypothetical could perform both jobs, but a person limited to sedentary work only the receptionist position. (Tr. at 484.) Later in the decision, the ALJ indicated that plaintiff's "musculoskeletal complaints would reasonably be expected to limit her to light work with some postural limitations [prior to her date last insured.]" (Tr. at 23.)

14

than might be expected from the arthritis alone," and that the ALJ should assess how obesity affects functions such as walking and standing);[4] Hutchens v. Commissioner of Social Sec., 248 Fed. Appx. 788, 790 (9th Cir. 2007) (remanding where the ALJ found that the claimant suffered from a severe knee impairment, yet had no standing or walking limitations, and failed to reconcile this apparent conflict); Barrett v. Barnhart, 355 F.3d 1065, 1068 (7th Cir. 2004) ("Even if Barrett's arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both."); Masch v. Barnhart, 406 F. Supp. 2d 1038, 1051 (E.D. Wis. 2005) (reversing where the ALJ found the plaintiff capable of light work but failed to account for limitations on standing and walking based on obesity). Nor did the ALJ consider the effect of plaintiff's use of a cane.[5]

The Commissioner counters that while SSR 96-8p requires the ALJ to assess a claimant's abilities on a function-by-function basis, it does not mandate a specific, written finding on each function. Thus, the Commissioner argues that the ALJ's failure to specify a standing/walking tolerance does not require reversal. SSR 96-8p may contain a distinction between what the ALJ must consider and what he must articulate in his written decision, see, e.g., Lewis v. Astrue, 518 F. Supp. 2d 1031, 1043 (N.D. Ill. 2007), and in some cases a court may be able to divine that the ALJ performed the required assessment despite the lack of a full discussion. However, the Ruling does state, in the "narrative discussion requirements" section,

---

[4]The ALJ quoted extensively from SSR 02-01p (Tr. at 18-19) yet failed to engage in the required analysis under the facts of this case.

[5]The ALJ noted Mr. Heflick's testimony that plaintiff had a cane in 2003 but did not use it frequently due to pride. (Tr. at 20.) He provided no further analysis on the issue.

15

that the ALJ must "describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p.

In the present case, the ALJ discussed some of the medical evidence pertaining to plaintiff's knee problem, noting findings of "moderate" or "slight" degenerative changes, and pain control with medication (Tr. at 21), but he did not relate that evidence to walking or standing, or explain how he squared his finding of a severe knee impairment with his (presumed) finding that plaintiff could perform light work (i.e., stand/walk most of the day). I cannot find the error harmless; defendant's severe impairments plainly implicate her ability to ambulate, which is crucial to light work. Nor, absent some explanation in the decision, can I accept the Commissioner's argument that the ALJ's postural limitations fully accounted for plaintiff's knee impairment, as aggravated by her other conditions. See Steele, 290 F.3d at 941 ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.").

The Commissioner argues that remand to determine whether plaintiff can perform light work is unnecessary because the state agency consultant found her capable of standing/walking six hours out of an eight hour day. (Tr. at 208.) But the ALJ did not rely on this report, making the Commissioner's argument impermissibly post-hoc. See, e.g., Golembiewski, 322 F.3d at 916 ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). The Commissioner also cites certain medical evidence tending to

16

downplay the severity of plaintiff's knee condition, which the ALJ did not cite, again contrary to principles of administrative law. The ALJ found plaintiff's knee impairment severe, meaning that it significantly limited her physical ability to do basic work activities. 20 C.F.R. § 416.921(a). Absent some explanation, I cannot reconcile the ALJ's finding of a severe knee impairment, compounded by severe obesity, with the ability to stand or walk most of the day.[6]

The ALJ also erred in rejecting Dr. Gilman's August 2005 reports. Regarding the incontinence questionnaire, the ALJ noted that it was prepared eleven months after plaintiff's date last insured, that there was no indication that the report took into account plaintiff's use of medication or that it encompassed the time-frame preceding her date last insured, and that certain treatment notes from the relevant period did not mention the condition. (Tr. at 22.) If the report failed to clearly indicate whether it <u>did</u> encompass the relevant time period or account for use of medication, the ALJ should have re-contacted the doctor for clarification rather than assuming that it did <u>not</u>. <u>See</u> SSR 96-5p. Dr. Gilman had been treating plaintiff for this condition since February 18, 2002; this was not a situation in which a new physician offered a diagnosis post-date last insured.

Further, the treatment records do not appear to support the ALJ's assumption that the report did not cover the relevant period or that medication controlled the problem. On July 31, 2003, seven months after her alleged disability onset, plaintiff reported that she had to use the

---

[6]I also note that the ALJ denied the claim at step four, finding that plaintiff could perform her past work both as she did it and as it is generally performed. (Tr. at 23.) However, rather than listing the specific physical requirements of the previous jobs and assessing, in light of the available evidence, plaintiff's ability to perform these tasks, the ALJ appeared to describe the jobs generically and conclude, on the basis of plaintiff's RFC, that she could return to her previous work, contrary to <u>Nolen</u>, 939 F.2d at 518; <u>see also</u> <u>Delgado v. Bowen</u>, 782 F.2d 79, 83 (7th Cir. 1986) ("Mere categorization of the work and the claimant's capacities is not enough; particulars of the job and the claimant's capacities must be considered.").

17

bathroom up to eight times per hour (Tr. at 147), and Dr. Gilman prescribed Ditropan (Tr. at 148). Plaintiff continued to use Ditropan in October 2003. (Tr. at 146.) As the ALJ noted, Dr. Gilman did not mention this condition in his July 2004 and February 2005 notes, but in his August 16, 2005 note, Dr. Gilman indicated that plaintiff continued to experience detrusor activity with frequent urination, despite her current use of Ditropan three times daily. (Tr. at 390.) In his August 24, 2005, note – the same date he prepared the report – Dr. Gilman wrote: "She also has detrusor over activity with urge incontinence which is quite troublesome and not terribly responsive to Ditropan 5 md t.i.d." (Tr. at 389.) Thus, given the notes discussing this problem during the relevant period and indicating that the problem did not respond to medication, it was not reasonable for the ALJ to assume that the report did not cover the relevant period or neglected to consider use of medication. The error is not harmless; the VE testified that the need to take unscheduled bathroom breaks would preclude work. (Tr. at 485.)[7]

Regarding the knee questionnaire, the ALJ again found that the opinions expressed therein were based on the time-frame after plaintiff's date last insured. In support of this finding, he stated that the treatment notes did not specifically mention the knee as a primarily source of pain until February 2005, and that plaintiff's heavy use of Vicodin started in April 2005. (Tr. at 23.) As with the previous questionnaire, because Dr. Gilman had treated plaintiff

---

[7]The ALJ stated that Dr. Gilman's finding that plaintiff had to use the bathroom four times per hour exceeded the frequency noted by plaintiff and her husband in their testimony. (Tr. at 22.) Plaintiff testified that she used the bathroom a "[c]ouple of times an hour." (Tr. at 442.) Even with medication, the urge remained and accidents occurred. (Tr. at 444.) Mr. Heflick testified that plaintiff used the bathroom "[a]t least every hour. Sometimes a couple times an hour." (Tr. at 469.) This testimony does not undermine Dr. Gilman's report, certainly not to the extent that the ALJ could reasonably reject it outright.

18

since February 2002, the ALJ's assumption as to the report's scope seems unfounded. Re-contacting the doctor could have clarified the issue. And again, the treatment notes do not clearly support the ALJ's assumption, as plaintiff treated for severe knee pain and obtained strong pain medications beginning just prior to her alleged onset date, continuing though her date last insured and thereafter. (Tr. at 154-58; 401-02.)

The Commissioner states that Dr. Gilman's opinions about plaintiff's knee are contrary to the findings of the state agency consultant. But as indicated above, the ALJ did not rely on the consultant's report, so the Commissioner's argument is again impermissibly post-hoc. The Commissioner also states that the court should generally respect the ALJ's reasoned judgment on whether to collect more evidence or seek clarification. In this case, the ALJ rejected the opinions of a long-time treating physician, offered less than one year post-date last insured, despite the fact that the reports themselves contained no time limitation, and in the absence of substantial evidentiary support in the treatment notes. Under these circumstances, before declaring the reports irrelevant to plaintiff's functioning during the pertinent time period, the ALJ should have re-contacted Dr. Gilman.[8] As it stands, the ALJ's decision fails to provide good reasons for the rejection of these treating source reports. See, e.g., Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).

Therefore, the matter must be remanded for reconsideration of plaintiff's RFC, to include evaluation of her ability to stand and walk in light of her impairments, and re-evaluation of Dr. Gilman's reports. In reconsidering RFC, the ALJ must evaluate all limitations that arise from

_____

[8]The Commissioner notes that plaintiff's counsel did not argue that the record was inadequate or that the ALJ should re-contact Dr. Gilman. But absent some indication that the ALJ would reject the reports largely because they post-dated the relevant period, counsel had no reason to do so.

19

plaintiff's medically determinable impairments, even those that are not severe, Villano, 556 F.3d at 563, as well as the effects of plaintiff's obesity on her ability to function, SSR 02-1p.

## B. Credibility

### 1. Legal Standard

Generally, the court must defer to an ALJ's credibility determination because he had the opportunity to personally observe the claimant's demeanor at the hearing. Windus v. Barnhart, 345 F. Supp. 2d 928, 945 (E.D. Wis. 2004). Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003). However, where the credibility determination is based upon objective factors rather than subjective considerations, the court has greater freedom to review the ALJ's decision. Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008). Further, the ALJ must comply with SSR 96-7p in evaluating credibility. Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003).

SSR 96-7p sets forth a two-step process for evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness. First, the ALJ must consider whether the claimant suffers from a medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms. If not, the symptoms cannot be found to affect the claimant's ability to work. Second, if the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which they limit the claimant's ability to work. The "ALJ cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record." Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009). Rather, the ALJ must make a credibility finding based on an evaluation of the entire case record, considering

20

factors such as the claimant's activities; the duration, frequency and intensity of the symptoms; precipitating and aggravating factors; treatment modalities; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. The ALJ must provide specific reasons for the credibility finding, <u>Arnold v. Barnhart</u>, 473 F.3d 816, 822 (7th Cir. 2007) (citing SSR 96-7p), supported by the evidence and specific enough to enable the claimant and a reviewing body to understand the reasoning, <u>Craft</u>, 539 F.3d at 678.

### 2. Analysis

In this case, the ALJ found that plaintiff's impairments could reasonably be expected to produce the symptoms alleged, but that plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. at 21.) The ALJ provided three reasons for his finding: (1) plaintiff said she used medication for incontinence when she last worked in 1999, but the record showed she was first prescribed Ditropan in 2003; (2) plaintiff was apparently able to work in 1999, despite her incontinence; and (3) she continued to engage in ongoing equestrian activities, which the ALJ found contrary to urinary incontinence and debilitating musculoskeletal complaints. (Tr. at 21.)

The ALJ failed to explain how plaintiff's experiences at work in 1999 pertained to her credibility regarding the relevant time period (January 1, 2003 to September 30, 2004), or to consider that her symptoms may have worsened between 1999 and 2003. Plaintiff testified that her incontinence was starting to become an issue at her last job in 1999. (Tr. at 461.) The ALJ also skipped medical evidence that plaintiff saw her doctor about frequent urination and had obtained medication (Detrol) as early as February 2000. (Tr. at 204.) The fact that the medication was Detrol (also prescribed for "the treatment of patients with overactive bladder

21

with symptoms of urinary frequency, urgency or urge incontinence," McCurley v. Astrue, No. 06-CV-649, 2008 WL 4682260, at *3 n.9 (N.D. Okla. Oct. 22, 2008) (citing the Physicians' Desk Reference)) rather than Ditropan seems irrelevant.

Regarding her equestrian activities, plaintiff testified that she no longer rode or showed horses, stating: "They're just lawn ornaments now." (Tr. at 448-49.) It is not clear what evidence the ALJ relied upon in finding that plaintiff continued to engage in these activities during the relevant time period. As one point, he quoted a treatment note from Dr. Gilman indicating that plaintiff's problems were "secondary to long equestrian activities." (Tr. at 22.) In context, it appears that Dr. Gilman meant plaintiff's injuries resulted from years of riding and showing horses, not that she continued to do so. The Commissioner points to a November 2004 note in which Dr. Lynch indicated that plaintiff "rides horse." (Tr. at 184.) But the ALJ did not rely on this note, and even if plaintiff did continue to ride horses after her alleged onset of disability, the ALJ failed to discuss the nature, extent and duration of such activities or to explain how they undercut plaintiff's credibility. The Seventh Circuit has repeatedly cautioned ALJs about relying on daily activities in assessing ability to work full-time outside the home, see, e.g., Moss, 555 F.3d at 562 (citing Craft, 539 F.3d at 680; Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006)), as there is a "difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week." Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir. 2004).[9]

─────────────────

[9]The Commissioner notes that plaintiff cared for her granddaughter. Again, the ALJ did not rely on this activity. Further, plaintiff testified that this care was limited to feeding her granddaughter breakfast and putting her on the bus in the morning, then watching her for less than an hour after school. (Tr. at 456-57.) These limited childcare activities are in no way inconsistent with disability. See, e.g., Gentle v. Barnhart, 430 F.3d 865, 867-68 (7th Cir. 2005).

For all of these reasons, the ALJ will on remand have to reconsider the credibility of the testimony.

**C.      Hypothetical Questions**

"If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." <u>Indoranto</u>, 374 F.3d at 474.  "The reason for the rule is to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations." <u>Steele</u>, 290 F.3d at 942.  A decision based upon an incomplete hypothetical is subject to remand. <u>See</u> <u>id.</u> at 942-43.  In the present case, the ALJ failed to properly consider all of plaintiff's impairments in determining RFC, as discussed above.  On remand, he must, after reconsidering RFC, pose complete questions to the VE.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this decision.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 20th day of May, 2009.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

23